Kaplan, Mitchell H., J.
This case is before the court on the parties’ joint petition to approve their settlement of personal injury and loss of consortium claims underG.L.c. 152, §15. Liberty Mutual Insurance Company (“Liberty”),[2] which stands in the position of a workers’ compensation insurer that has made medical and indemniiy payments to the plaintiff, Robert J. Janocha, under chapter 152, objects to the parties’ allocation of the settlement proceeds between the injured employee and the loss of consortium plaintiffs.
As of April 26, 2010, Mr. Janocha had received $59,954 in medical benefits and $198,808 in indemnity payments. He is fifty years old and continues to receive disability payments in the amount of $622 a week as a result of permanent, total disability. The parties to the underlying action reported to the court that they had reached a settlement, contingent upon the court’s approval, pursuant to which the defendant, Wood Mill, LLC, would pay to the plaintiffs the aggregate sum of $465,000 apportioned as follows: 20% to Robert Janocha; 40% to Janet Janocha; 20% to Andrew Janocha; and 20% to Thomas Janocha[3] — the payments to Janet, Andrew and Thomas are in settlement of their claims for loss of consortium arising out of personal injuries suffered by Robert. After deduction of Robert’s allocated share of attorneys fees and litigation expenses ($31,000 and $2,250, respectively) his net recovery is $59,750, an amount substantially less than Liberty’s lien, and leaving no “excess” for reimbursement of Liberty’s continuing obligations to Robert. Liberty objects to that settlement, asserting that it does not constitute a fair allocation of the settlement proceeds between Robert, on the one hand, and his wife and children, on the other. Liberty does not object to the gross amount of the settlement.
The plaintiffs, defendant and Liberty first appeared before the court on the petition for approval on May 13, 2010. After hearing their respective positions, the court determined that an evidentiaiy hearing was required on the issue of “fair allocation.” A hearing was convened on Mayl7, 2010. The plaintiffs presented the testimony of Michael Gallagher, the attorney who represented Wood Mill in the underlying litigation, and Janet. Liberty cross-examined each of the witnesses. The Plaintiffs also offered in evidence letters written by Andrew and Thomas. The court sustained objections to their admission, and they have only been marked for identification. Five exhibits were admitted; among them is a Power Point presentation prepared by Wood Mill and used at a mediation that produced the settlement. It may be noted that Liberty was present at the mediation, but did not participate in the settlement.
FACTS RELEVANT TO THE UNDERLYING CLAIMS
Beginningin 1987, Robert was employed by Malden Mills at its Lawrence facility as a maintenance mechanic. On Friday, January 21,2005, Robert, then age 45, was assigned to work at warehouse space leased from Wood Mill. This warehouse, also located in Lawrence, is a 104-year-old, six-story structure. Among other areas, Malden Mills occupied space on the fourth floor of a portion of the building. Wood Mill engaged a separate contractor, Masslnovation, to manage the building and a separate safeiy consultant to develop safely policies for it.
On the morning of Friday, January 21, 2005, Robert received a report that water was leaking into Malden Mills’ fourth-floor space. Although not a part of its leased premises, Robert proceeded to take the elevator to the sixth floor to investigate. There he saw a hose in the hallway spewing water from a coupling. He followed the hose to the door to a stairway that led down to the floors below. The door to the stairway, although usually locked, was propped open with a barrel and the hose continued down the stairs. A movable caution sign was placed outside the doorway. Robert heard a pressure washing machine running and knew that other stairways had been pressure washed a few weeks before. He called out, and hearing no response, started down the stairs to find the workers operating the pressure washing machine. Robert began to descend, while holding the right hand rail. After a few stairs, he started to step over the hose and fell landing on his buttocks.
Other facts relevant to Robert’s fall include the following. Robert knew that the sixth floor was not Malden Mills’ space. He knew the Wood Mill facility manager and how to contact him. He was aware that power washing had occurred a few weeks earlier and had complained to the facility manager when water had leaked into Malden Mills’ space during that operation. He therefore understood that power washing was in progress on January 21st when he started down the stairs and that the stairs might therefore be wet. He had a history of prior accidents which, in particular, had caused him to have chronic weakness in his right ankle and also, to some extent, problems with his right wrist. The stair steps had steel grooved *198 treads across their length. Wood Mill had retained an engineer who performed tests using a boot like that worn by Robert at the time of the accident and the treads that established that the step was actually less slippery when it was moist than dry, presumably because this eliminated dust that might otherwise be present.
After the fall, Robert’s ankle hurt, but he did not believe himself otherwise to have been injured. He returned to work on Monday. On Tuesday, he awoke with neck pain. This pain apparently worsened over time and he saw his primary care physician on January 31, 2005 complaining of shoulder and neck pain and numbness and tingling in his hand. Over the next several months the pain became bilateral, and he also exhibited weakness in his upper extremities and some involvement with his legs. Robert began physical therapy but continued to work. In October 2005, Robert had a multi-level, cervical surgical procedure to decompress his spinal cord. There followed several years of follow-up for pain management and related psychological issues. At some point, Robert ceased working and was found to be totally disabled.
Wood Mill retained a medical expert to perform an independent medical examination of Robert and a review of his veiy substantial medical history, both before and after January 21, 2005. The expert’s lengthy report concludes that Robert had: (1) a history of neck problems before the date of his fall on the stairs; and (2) significant congenital problems with his spine that caused degenerative disease and were going to cause the problems that he eventually experienced even if he had not fallen on January 21st, although that fall might have been the trigger for the pain and other symptoms that he began to experience shortly thereafter. The report also suggests, based on the notes of Robert’s psychologist, that Robert has had a psychological response to his persistent pain that has increased his physical disabilities beyond what they would otherwise be. Wood Mill had retained other experts to testify that there were jobs in the local economy that Robert should be able to perform. Robert, however, also had expert testimony that attributed much of his present physical disabilities to the fall, although acknowledging the presence of significant degenerative spinal disease.
Robert’s condition has undisputedly had a profound effect on his relationship with his wife, Janet, and his two sons. Robert and Janet have known each other since childhood. Prior to the accident, they enjoyed camping, fishing and other outdoor activities in which they no longer engage. Robert and Janet live in New Hampshire in a home on a substantial parcel of land with abutting trails. Robert can no longer do the chores and repairs that he previously did to maintain the property, and Janet and her sons cannot manage it themselves without help. Robert and Janet’s social life has also changed substantially, as they no longer have parties and gatherings at their home because Robert is unable to help with the preparation and entertaining. Additionally, friends and family are reluctant to come by because they are often asked to help with chores or repairs. In consequence, Robert and Janet are also not invited out as much.
Janet reports that in addition to the effect of Robert’s injuries on their social life, their sex life has been much diminished, although they still engage in sexual activity (although sometimes without success). In general, Janet’s testimony suggests that Robert was previously an active man both physically and socially, but mostly now sits around.
Robert and Janet have two sons, Andrew and Thomas, aged 10 and 8, at the time of the accident. Robert no longer takes them camping, rarely fishing, and cannot engage in sports with them. As an example, they previously rode all terrain vehicles together, but Robert will no longer do that. He has difficulty showing them how to build and repair things, although he was previously skilled at that and has a shop in his garage. The Janochas have had few family vacations since the accident, and Robert mostly stayed in the hotel when they did go. Robert also does not drive frequently or for long distances, and this limits his ability to take the children places or attend events in which they are participating. Because Janet leaves for work early in the morning, Robert does, however, get the boys up in the morning and see them off to school.
Janet worked as an accountant before the accident and has continued that job since the accident. Robert is fully capable of caring for himself, i.e., he can prepare his own meals, dress himself and manage all of his personal hygiene.
DISCUSSION
Liberty argues that this motion to approve the settlement is premature because the parties to it have not yet executed the definitive settlement documents and the plaintiffs have not bound themselves to accept the $465,000 in full settlement of their claims, even if the court declines to approve the proposed allocation. It is Liberty’s position that G.L.c. 152, §15 requires an unconditional settlement to be presented to the court otherwise the defendant, in this case Wood Mill, becomes complicit in supporting the proposed allocation. The court disagrees. §15 requires the court to approve the settlement. The word ‘settlement’ is undefined. There is nothing in that section that suggests that a settlement cannot be contingent. Further, the section makes the insurer a party to the proceedings in which the court determines whether the allocation of the settlement proceeds among the injured worker and the consortium plaintiffs is fair and reasonable in order that the proceeding be adversarial and the insurer able to protect its interests. Finally, the Appeals Court effectively rejected Liberty’s position in Walsh v. Telesector Resources Group, Inc. 40 Mass.App.Ct. 227, *199 233 (1996). In holding that §15 does not authorize a judge to reallocate settlement proceeds in a manner other than that to which the parties had agreed, the Appeals Court there stated: “There is nothing in the statute itself to support the proposition that the Legislature has given a judge the authority to bind parties to settlement terms to which they have not agreed. Such a proposition would not only greatly discourage settlement agreements, it would contradict the basic principle of law that a party cannot be bound to essential and material terms of a contract to which he has not agreed.” That comment seems equally applicable to this situation. A requirement that the plaintiffs accept $465,000 in settlement of their claims without knowing whether the court will approve the apportionment would greatly discourage settlements. Further, in this case all the plaintiffs have the same counsel and have proceeded as a group, but certainly their interests are not the same. One can easily imagine situations in which the settlement was, in part, the result of arm’s-length negotiations between or among consortium plaintiffs and such plaintiffs with the injured party. The settlement would then only reflect the parties’ negotiated agreement, if those competing interests, as reflected in the apportionment, were preserved. The court finds that the plaintiffs have the right to move for approval of a settlement contingent on the court accepting the proposed allocations.
Turning to the allocation itself, under §15 the sum recovered by an injured worker from a third party “shall be for the benefit of the insurer, unless such sum is greater than that paid by [the insurer] to the employee . . .” “[W]hen allocating the proceeds from the settlement of a third-parly tort action brought by an injured employee, an insurer’s right to full reimbursement of benefits it has paid to the injured employee under G.L.c. 152, or to members of his family under §31 or §35A of G.L.c. 152, may not be compromised, abridged or equitably allocated to others so as to deprive the insurer of its lien . . . The claims of the spouse [or children] of an injured employee for loss of consortium, however, are entirely independent and distinct from the personal injury claims of the employee.” Hultin v. Francis Harvey & Sons, Inc., 40 Mass.App.Ct. 692, 694-95 (1996). Further, while the employee’s claims may be diminished or defeated by his own comparative negligence, the consortium claims will succeed if a jury finds that the third party was “causally negligent to some degree for [the employee’s] accident.” Id. at 698.
With these principles in mind, the court turns to the evidence presented at the hearing in the instant case. The plaintiffs presented substantial evidence through the testimony of the attorney for Wood Mill that Wood Mill simply was not negligent at all. Through cross-examination of that witness, Liberty elicited testimony that Robert’s injuries may well have been the result of degenerative disease and not the fall (and, to some extent, that they may not have been as severe as Robert contends they are). The plaintiffs argue that counsel’s testimony establishes that, in this case, as in Hultin, the consortium claims maybe easier to prove than Robert’s because of the risk that the jury would find that Wood Mill was negligent, but so was Robert, and his negligence was more than 50% the cause of the accident, thereby requiring a defendant’s verdict with respect to his claim. Liberty counters that the evidence presented through the testimony of Wood Mill’s attorney establishes that Wood Mill was not responsible for the accident because it did nothing negligent and, moreover, the fall did not cause Robert’s condition. Liberty points out that Robert did not testify at the hearing, and there was no evidence that he acted negligently.[4] And, indeed, courts regularly instruct juries that the mere happening of an accident is not proof of negligence. One can fall on stairs without any party being negligent.
The court notes that the type of proof summarized by Wood Mill’s counsel at the hearing can be found by a juiy to diminish a defendant’s negligent conduct when compared to the that of the plaintiff, and, therefore, might defeat Robert’s claim without establishing that Wood Mill was not somewhat causally negligent. On the other hand, counsel’s testimony was quite persuasive in demonstrating that Wood Mill was simply not negligent. And Wood Mill’s medical expert’s report was also persuasive on the question of whether Robert’s injury was the result of congenital, degenerative disease rather than the fall. In sum, this testimony certainly created the possibility that the consortium plaintiffs could recover, but not Robert, but clearly also that a trial would simply result in a defendant’s verdict.
In Walsh, the Appeals Court referenced the trial judge’s acceptance of plaintiffs counsel’s “belieF that consortium settlement’s are usually in the range of twenty percent “of the amount set aside for the injured spouse.” 40 Mass.App.Ct. at 229-30. In the instant case, Wood Mill’s counsel testified that he was very experienced in personal injury litigation of this sort and was unaware of any jury that had awarded consortium plaintiffs more than the injured parly received. Finally, in Hultin, the Appeals Court “reemphasize[d] the strong policy underlying the workers’ compensation statute against the sort of double recovery that is possible whenever settlement of a third-party claim involving an injury to an employee and the loss of consortium of a spouse or family member has been so structured as to insulate a significant portion of the proceeds from the insurer’s statutory rights to full reimbursement of compensation benefits it has already paid, and to a possible offset against any excess recovery of future compensation benefits it may have to pay.” It also directed the court to “eye . . . with a healthy dose of skepticism” settlement allocations that award the bulk of the *200 proceeds to the consortium claims. 40 Mass.App.Ct. at 699.
In the instant case, the plaintiffs note that in Huitín the Appeals Court affirmed the trial court’s approval of a settlement which awarded 79% of the settlement proceeds to the spouse and point out that here there are three loss of consortium plaintiffs, the spouse and two sons. However, in Huitín the employee/plaintiff s injuries appear to have been much more severe, involving extensive burning over much of his body. The employee and his spouse could not engage in marital relations at all after the accident. Even more significantly, the spouse could no longer work as she had to “provide day-to-day care for her husband, including preparing his meals and assisting him with bathing and dressing.” Further, “because [the employee] has little control over his hands or his grip, the wife must perform certain basic manual operations for him.” Id. at 697. Additionally, in Huitín, there were investigative reports that concluded that the plaintiffs own negligence was causally related to his accident, if not the principal cause of it. In summary, many of the “countervailing factors” supporting the allocation of 79% of the settlement proceeds to the spouse in Huitín are not present in this case.
The court credits the testimony of Janet, believes that she and her sons have valuable consortium claims, and is very sympathetic to their position. However, in the exercise of its reasoned judgment, and in view of the legislative directive that third-pariy settlement proceeds are for the benefit of the insurer until it is repaid the amount that it has and will continue to pay to the injured employee, the court cannot find that the 80%-20% constitutes “fair allocation.” Of course, there is no specific allocation of the settlement proceeds that would be the “fair allocation,” but rather there is undoubtedly a range that a court could approve as fair. In Huitín, the Appeals Court reiterated its holding in Walsh that the trial judge is “confined to approving or rejecting the parties’ proposed allocation” and could not “substitute his judgment” for theirs. It did, however, go on to note that the judge “could have made disinterested observations as to a different allocation.” Id. at 698 n.8. This court is not comfortable suggesting specific allocations, but can say that considering the persuasiveness of Janet’s testimony, it would have approved settlements that awarded more than a majority of the proceeds to the loss of consortium plaintiffs, but not 80%.
ORDER
For the forgoing reasons, the parties’ motion to approve the settlement is DENIED.[5]

 Liberty comes to stand in the shoes of the insurer as a result of the following transactions. Robert Janocha was an employee of Malden Mills, Inc. Prior to March 13, 2007, Malden Mills was self insured for workers’ compensation claims and provided a surety bond to the Commonwealth issued by Safeco Surety Company covering its self insurance obligations. At that time, Malden Mills filed bankruptcy proceedings and the Commonwealth made claim on the bond. Mr. Janocha’s claim is among those covered by Safeco’s bond, and Safeco holds the lien on Mr. Janocha’s recovery in this case under G.L.c. 152, §15. Safeco is presently owned by Liberty. For simplicity, the entity making payments to Robert Janocha will be referred to generally as Liberty in this memorandum.

 Robert and Janet are husband and wife, and Andrew and Thomas are their two sons. The plaintiffs will be referred to by their first names for simplicity.

 In Huitín, investigations of the accident conducted by [OSHA] and a state agency “both concluded that [the employee’s] actions were a contributing, if not the major contributing, cause of the accident.” Id. at 698 n.6.

 The plaintiffs also moved for approval of the award as in the best interests of the minor children under G.L.c. 231, §140Cl/2. Had the court approved the allocation, it would have’ approved the amount and structure of the children’s settlement of their claims.